NATHANIEL P. FISHER *versus* ASA WHITMAN *et al.*

Where several inhabitants of a town entered into a written agreement to form themselves into a religious society, and a meeting of the associates was soon after held, at which a moderator, a clerk, a prudential committee, and a committee for signing certificates of membership, were elected, it was *held* that this was a regular formation and organization of a religious society pursuant to *St.* 1811, *c.* 6.

Voluntary associations under this statute are not governed by the laws regulating incorporated religious societies, in relation to the calling of meetings, the time of holding them, the choice of officers, or the qualifications of voters; and it is not essential to their legal organization that their clerks should be under oath.

This statute does not require that the certificate of being a member of a religious society shall be filed with the town clerk by the member himself, but *it seems* that, in order to dissolve his connection with the society to which he previously belonged, the filing should be by his authority, signified by previous command or subsequent ratification.

This statute is in no part repealed, expressly or by implication, by *St.* 1823, *c.* 106.

TRESPASS for an assault and battery and false imprisonment.

At the trial in the Court of Common Pleas, before *Williams* J., it appeared that the defendants were the assessors of the town of Walpole for the year 1831, and that the town was accustomed to transact its parochial business in town

meetings. At a town meeting on May 11, 1831, in the afternoon, the inhabitants voted to raise by tax the sum of $700, for parochial charges, a part of which sum, viz. $123, was required to pay the arrearages of the year ending April 30, 1831. In assessing the parish taxes for raising this sum of $700, which was done on August 29, 1831, the defendants assessed upon the plaintiff's poll and estate the sum of $2.38 for his proportion ; and he was arrested by virtue of the defendants' warrant and detained until he paid this tax. The proceedings of the defendants were legal, if the plaintiff was liable to taxation in the parish tax for that year ; otherwise not.

The plaintiff was an inhabitant of Walpole, and was liable to pay parish taxes in the town, unless he was exempted by the following facts.

On October 4, 1826, the plaintiff and others signed a writing, by which they " manifest their secession " from the parish or first society, and " agree to unite in forming another religious society in Walpole by the name of the Orthodox Congregational Society in Walpole," and adopt as rules for the constitution of the society, that at the first meeting under the agreement the society shall elect, 1. One of their members as clerk, who shall record all the votes passed by the society ; 2. A standing committee of five, who shall have the management of all the concerns of the society according to the votes of the society ; 3. A committee of three, whose duty it shall be to make certificates, for the purpose of giving to the first society in Walpole, legal notice who are members of the society hereby formed ; and that the so ciety shall have the right to make all such by-laws as they shall think fit to adopt from time to time, for the better carrying the purpose of the society into effect.

By the book containing the records of this society it appeared, that a meeting was held on October 9, 1826, at which a moderator, a clerk, a standing committee, and a committee for signing certificates, were severally chosen, but there was no record or evidence that the clerk was sworn ; and at an adjournment of the same meeting, on October 16th, it was voted, " that the committee shall carry to the

town clerk the certificates of all the individuals now belong-ing to the society." Annual meetings were held on October 9, 1827, November 3, 1828, October 8, 1829, and September 15, 1830. At each of these meetings John Morse was chosen clerk and was sworn by the moderator. Other officers were also chosen. Up to this time no meeting had been held in March or April.

A certificate dated November 13, 1826, and signed by the committee appointed by the society to sign certificates, was filed with the town clerk on the 14th of November. The certificate states, that Nathaniel P. Fisher and sixty-three other persons (naming them) in the town of Walpole, are members of the religious society in Walpole, called the Orthodox Congregational Society in Walpole. Another certificate, dated April 30, 1831, and signed by John Morse as clerk of the Orthodox Congregational Society in Walpole, and stating that Fisher and sixty-eight others (who are named) are members of the same society, was filed with the town clerk on the same 30th of April. It did not conclusively appear, nor was it admitted by the defendants, that these certificates were filed by the plaintiff or by any person at his request.

Another certificate, dated May 10, 1831, and signed by Morse as clerk of the society, and stating that Fisher and eighty-nine others named, elect to join and are members of the society, was filed with the town clerk, at the plaintiff's request, in the morning of May 11, 1831, and before the hour at which the town meeting was held on the same day.

On May 2, 1831, fourteen of the qualified voters of the town and members of this society, of whom the plaintiff was one, made a written application to a justice of the peace, requesting him to call a meeting of the society; and he issued his warrant accordingly, directed to one Allen, calling a meeting on the 10th of May. Allen made return on the warrant, that he had " notified the members of the Orthodox Congregational Society to meet " &c. It appeared that notice was duly given by him to the fourteen persons who had signed the application, and to no others, but more than thirty persons were present and voted at the meeting.

At this meeting Morse was chosen clerk, and he made ʒath that "he would truly and faithfully perform the duties of clerk."

Previous meetings of the society had been warned by posting up at their meetinghouse, notifications stating the time, place and purposes of the meeting, and signed "By order of the committee, John Morse, clerk." There was no return on these notices. At a meeting on November 13, 1826, it was voted, "that it shall be legal to put up notice for a meeting of the society at this place, at least seven days before the meeting." This meeting was at a hall in which the meetings of the society for public worship were at that time held. The notice for the meeting on September 4, 1830, was posted up and the meeting held at the society's meetinghouse, which was built on a different site, after the above vote was passed.

The society had, ever since its formation to the time of the trial, maintained public worship in the society, and had then a settled minister.

The defendants objected to the admission of the agreement of October 4, 1826, and to the book of records, as competent evidence to prove any fact anterior to May 2, 1831 ; and also to the sufficiency of the notices as warrants for calling meetings ; which objections were overruled and the evidence admitted.

The judge being of opinion that the plaintiff was entitled to recover, so instructed the jury, who returned a verdict for the plaintiff accordingly. To this opinion and instruction the defendants filed exceptions.

*Walcutt* and *H. Mann*, in support of the exceptions, argued, that the plaintiff and his associates did not constitute a religious society recognised by the law. All persons and property within the commonwealth, with certain exceptions, are liable to be taxed by some religious society, and payment of the tax may be enforced by process of law. Declaration of Rights, *art.* 3 ; *St.* 1799, *c.* 87, § 2, 4, 5 ; *St.* 1823, *c.* 106, § 3 ; *St.* 1826, *c.* 77, § 2. We contend that there was no society in Walpole, except the parish or first society, that was so organized as to be able to enforce

*Jan. 17th,*
*1833,*
*at Boston.*

30 *

Fisher
*v.*
Whitman.

the payment of such a tax. Provincial statutes, in Ancient Charters &c., 374, 435, 487, 491. These statutes, so far as regards the organization of religious societies and the calling of meetings, have not been repealed by *St.* 1786, *c.* 10, § 2, *St.* 1799, *c.* 87, § 6, or any other statute, before *St.* 1823, *c.* 106 ; but if the statute of 1786 repeals them, then it must be construed to embrace all the cases provided for by the previous laws. Unincorporated societies are recognised by *St.* 1811, *c.* 6 ; but the effect of that was to put them upon the same footing with incorporated societies, and they became subject to the laws by which incorporated societies were regulated.

Now on comparing the proceedings of the new society with *St.* 1786, *c.* 10, they will be perceived to be defective in various particulars. The officers were never chosen in March or April ; § 1, 2 ; there were no legal warrants for calling the meetings, and no returns ; § 2 ; *Thayer* v. *Stearns*, 1 Pick. 112 ; and the notices were not posted up in the place designated by the vote of November 13, 1826. The new society then was not duly organized according to the law as it existed previous to the statute of 1823. But however that may be, as this society was not formed until 1826, it could be legally organized only in the mode pre scribed by the statute of 1823, upon an application of ten or more legal voters to a justice of the peace, requesting him to call a meeting. This mode was not resorted to until May 1831, and the proceedings under the application then made were not according to law. The warrant is, to notify " the members " of the society, and the return is, that " the members " were notified, when in fact only fourteen persons were notified, and yet thirty persons attended the meeting. And the oath taken by the clerk, that " he would faithfully ⁻erform the duties of clerk," was not pursuant to the statute, which requires that he shall be sworn " truly to record all votes " &c. *St.* 1786, *c.* 10, § 1. The meeting therefore on May 10, 1831, was not a legal meeting, and the society has never been legally organized.

But admitting that the society had a legal existence, it is not proved that the plaintiff had become a member of it

before May 10, 1831. It does not appear that the certificate of November 13, 1826, was filed with the town clerk by the plaintiff's direction ; and being signed by a committee, (pursuant to *St.* 1811, *c.* 6,) instead of the clerk of the society, it was invalid, for the statute of 1811 had been repealed by the statute of 1823. *Gage* v. *Currier,* 4 Pick. 399. The certificate of April 30, 1831, is also liable to the objection, that it was not filed at the request of the plaintiff.

If the plaintiff did not become a member of the new society until May 10, 1831, he was liable to taxation by the parish for the financial year from May 1, 1831, to May 1, 1832 ; and at least he was liable for the arrearages of the preceding year, and so there was merely an over-assessment, for which trespass will not lie.

In support of the objection to the records of the new society, they cited *Monumoi Great Beach* v. *Rogers,* 1 Mass. R. 159.

*S. Hubbard* and *W. J. Hubbard,* for the plaintiff.

MORTON J. delivered the opinion of the Court. The town of Walpole, like many other small towns, has always transacted its parochial business in town meeting. The plaintiff being an inhabitant of the town, was of course a member of the parish, and, as such, liable to taxation. This liability still continues, unless he has legally withdrawn from the parish. This could only be done by removing from the town, or by becoming a member of some other religious society and giving due notice thereof.

On the 4th of October 1826, the plaintiff and others entered into a written agreement to form themselves into a religious society, by the name of " the Orthodox Congregational Society in Walpole." And on the 9th of the same month a meeting of the associates was holden and a moderator, a clerk, a standing committee and a committee for signing certificates, were chosen. This appears to be a regular formation and organization of a religious society pursuant to the statute of 1811, *c.* 6. And the members then became entitled to all the privileges and exemptions secured by that act. The second section provides, " that whenever any

person shall become a member of such a religious society," and " such membership shall be certified by a committee of such society, chosen for this purpose, and filed with the clerk of the town where he dwells, such person shall forever afterwards be exempted from taxation &c., in every other religious corporation whatsoever, so long as he shall continue such membership." The statute then prescribes the form of the certificate.

On the 30th of November 1826, a certificate in the prescribed form, including the name of the plaintiff and more than sixty others, was made and signed by the committee chosen for that purpose. And on the next day it was filed with the town clerk. It is difficult to discover any even plausible objection to the organization of this society ; or to the evidence of the membership of those individuals whose names were contained in this certificate.

Although the statute of 1811 gives to voluntary associations some of the attributes of corporations ; yet they clearly do not come within the preëxisting laws relative to parishes and other religious societies. They are not governed by the regulations in relation to the calling of meetings ; the time of holding them ; the choice of officers ; or the qualification of voters. One object of this statute was to give legal existence to these associations, without subjecting them to the then existing rules applicable to other religious corporations. And perhaps its minor purpose, as is indicated in the title, was to remove burdensome restraints and impositions, and to increase religious freedom.

Formerly the whole commonwealth was divided into parishes, and every individual was holden to contribute towards the support of public worship in the parish where he resided. Before the revolution, some exceptions to this general rule, in favor of Quakers and some others, had been allowed. Our constitution introduced some further and still more liberal provisions. Subsequent to its adoption a new class of religious corporations, called poll parishes, were created. These possessed less extensive powers, and were relieved from some of the inconveniences and embarrassments to which territorial parishes had become subject.

The statute of 1811 established a third class of religious corporations, with still more limited powers and more extensive exemptions. They were not bound to impose taxes and were not required to have assessors. They were at liberty to call their meetings in such manner, and to hold them at such seasons of the year, as might suit their convenience or pleasure. They might regulate the admission and expulsion of members, and determine in what manner and by what officers they would manage their affairs. They could not well transact their corporate business without a recording officer ; but they might require or dispense with an oath of office, at their option. Although the keeping of records may be indispensable to the exercise of corporate powers, yet the statute does not require that their clerks shall be under oath. And whether without such qualification they would be competent to certify their records or not, it is not essential to their legal organization, or to the validity of the certificate of membership.

The statute provides that the certificate be filed with the town clerk of the town where the member resides. But it does not expressly require that he shall file it himself. It is however probable, that to be effectual, it must be done by his authority. For a person may join a voluntary society, and yet not desire to avail himself of the exemptions which the law will give him. He may wish to form a new religious connexion, and to perform his duties to his new associates, and yet choose not to withdraw his pecuniary liabilities from the corporation of which he had been a member. And surely no one can compel him to do so.

But he is not bound to file his certificate in person. Where, as in the present case, it may be convenient to include several in the same certificate, each one cannot deliver it to the town clerk. Nor would it be reasonable or practicable for all to join in the act. It may be done by an authorized agent, or if done without authority, it may be rendered valid by subsequent adoption or ratification. In this case the committee were directed by vote, to file a certificate for all the members of the society. Now whether the plaintiff was actually present at this meeting or not, his conduct in join-

ing the society just before, in continuing to act as a member in availing himself of all the legal exemptions and privileges of membership, and in contending for his rights in this suit, furnishes plenary proof of intention not only to become a member of the new society, but to dissolve his connexion with the old parish.

The plaintiff having become a member of the Orthodox Congregational Society, and having caused a certificate of his membership to be filed according to law, on the 14th of November, 1826, from that time ceased to be a member of the old parish or to be liable to taxation in it. And this exemption will continue as long as his membership continues. Has this ceased ?

The society has not, by any act of its own, dissolved itself. It has built a meetinghouse, settled a minister, and continues to maintain public worship. The continued existence of a corporate body does not depend upon the regularity or legality of the calling or conducting of its public meetings. Even if the meetings of the society holden under the statute of 1823, c. 106, were illegal, of which we see no evidence, it would not affect the legal existence of the society, or the plaintiff's membership in it.

It has very recently, upon full consideration, been decided, that the statute of 1823 does not repeal the statute of 1811 c. 6. Oakes v. Hill, 10 Pick. 333, 344. The former is expressly in addition to the latter, and thus recognises its continued operation. The statute of 1823 was intended to introduce new regulations, without abolishing old ones ; to prescribe new modes of calling meetings and organizing religious societies, without superseding those before used. It expressly gives an election. Each religious society may (not must) organize in the manner therein prescribed.

The second section introduces a new mode of separating 'rom one society and joining another, but does not abolish or supersede the old one. The one is not incompatible with the other. But each may be resorted to, as may be mos' convenient for the member or most consonant to the constitution or practice of the society which he desires to leave or join. Sumner v. First Parish in Dorchester, 4 Pick. 361.

From the view which we have taken of the case, it appears that the Orthodox Congregational Society in Walpole was legally constituted ; that the plaintiff became a member of it ; that he gave legal notice of his membership ; that the new society still continues to possess and exercise its powers and rights, and to perform its duties ; and that the plaintiff's membership in the new society, and of course his exemption from taxation in the old parish, still remain in force and unimpaired.

*Judgment of the Court of Common Pleas affirmed.*